UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

FORMAN HOLT ELIADES & RAVIN LLC
80 Route 4 East, Suite 290
Paramus, New Jersey 07652
(201) 845-1000
Attorneys for Charles M. Forman,
Chapter 7 Trustee
David S. Catuogno (DSC 1397)

| | |
|---|---|
| In Re:<br><br>KEARNY INDUSTRIAL ASSOCIATES, LP,<br><br>Debtor. | Case No.: 07-10169 (NLW)<br><br>Judge:    Hon. Novalyn L. Winfield<br><br>Chapter:   7<br><br>Hearing Date:  August 23, 2010<br>                    at 9:00 a.m. |

### APPLICATION IN SUPPORT OF MOTION AUTHORIZING TRUSTEE TO EXECUTE LETTER OF INTENT FOR SALE OF REAL PROPERTY AND APPROVING TRANSACTION FEE AND EXPENSE REIMBURSEMENT

Charles M. Forman, the duly appointed chapter 7 trustee (the "Trustee") for Kearny Industrial Associates, L.P. ("KIA" or the "Debtor"), by and through his attorneys, Forman Holt Eliades & Ravin LLC, submits this application for the entry of an Order (a) authorizing the Trustee to execute a Letter of Intent ("LOI") authorizing the Trustee to sell the estate's interest in certain real property situate on Passaic Avenue in Kearny, New Jersey (the "KIA Property") to Coremark Group LLC ("Coremark") for the sum of one million, five hundred thousand dollars ($1,500,000), which LOI sets forth the general agreement of the parties regarding proposed transaction and a protocol for consideration and approval and ultimately bringing a contract before the Court, and (b) approving a break-up fee and reimbursement of expenses related to the proposed transaction, respectfully represents as follows:

# I. <u>JURISDICTION</u>

1.     The Court has jurisdiction over this Motion under 28 U.S.C. §1334.  This matter is a core proceeding within the meaning of 28 U.S.C. §§157(b)(2)(A)(M)(N)&(O).

2.     The statutory predicates for the relief requested herein are §§105(a) and 363(b)&(f) of the Bankruptcy Code.  Also applicable are Federal Rule of Bankruptcy Procedure 6004.

3.     In accordance with Rule 6004(c), all parties who have liens, mortgages, or other interests in the KIA Property to be sold are being served with the within Motion, together with other parties on the service list.

# II. <u>BACKGROUND</u>

## A.     <u>Introduction</u>

4.     On January 4, 2007 (the "Petition Date"), KIA filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code").

5.     On August 8, 2007, the Court entered an Order directing the appointment of a chapter 11 trustee for the Debtor.

6.     On August 22, 2007, the Office of the United States Trustee appointed Charles M. Forman to serve as the chapter 11 Trustee for the Debtor's bankruptcy estate.

7.     On March 10, 2008, the Court entered an Order converting the case to a chapter 7.

8.     On March 10, 2008, the Office of the United States Trustee appointed Mr.Forman to serve as the chapter 7 trustee for the Debtor's bankruptcy estate.

## B.    The Kearny Property.

9.    Prior to the Petition Date, the Debtor owned the KIA Property consisting of a single parcel of real estate approximately 6.15 acres in size, situate at Belgrove Drive, Marshall Avenue and Passaic Avenue, Lots 4 and L3, Block 14 in Kearny, New Jersey.

10.    There are several structures on the KIA Property.  The main structure is the site of a former aluminum extrusion facility previously operated by American Modern Metals Corp. ("AMMC").  AMMC was a debtor in its own chapter 7 bankruptcy proceeding (Case No. 03-46555) which case was closed on March 24, 2005.

11.    The Debtor conducts no ongoing operations at the KIA Property (or anywhere else) nor were any active operations conducted during the pendency of the chapter 11 case.

12.    The KIA Property was scheduled as having a value of $6,000,000.  The Debtor also scheduled secured claims in the amount of $669,500, including real estate tax liens.

13.    This value scheduled by the Debtor was apparently never realistic.  Pre-petition the Debtor had a proposed sale in the $5 million range which sale ultimately fell apart due to the environmental condition of the KIA Property and the Debtor's inability to conclude the ISRA case. Complicating the matter further is that since that prior contract, the retail real estate market has taken a dramatic downturn in concert with the widespread and unprecedented economic turmoil.

14.    The Trustee sought and received Court authorization to retain an appraiser and obtained an appraisal which fixed the value of the KIA Property at $2,520,000 on an "as is" basis in recognition of likely remediation costs estimated at $1.5 - $2 million.  A copy of the appraisal report is annexed as **Exhibit "A"** to the Certification of David S. Catuogno, submitted in connection with a prior motion for Stay Relief filed by secured creditors, Quality Tax Holdings

LLC ("Quality") and Fortunato Realty LLC ("Fortunato"), which Certification is filed on the CM/ECF Docket herein as Document No. 180.

15.    Based upon the filed claims and other information developed during the course of administration, the Trustee determined that as of the Petition Date, the property appeared to be encumbered by tax liens in the initial face amount of approximately $400,000, most of which are owned by Quality; an asserted first position lien held by Hooper Street Acquisitions, LLC ("Hooper Street") in the amount of $219,000; an asserted second position lien held by Fortunato in the amount of $300,000; an asserted third position lien held by a joint venture designated as the Goldman/DiLorenzo Group[1] ("Goldman/DiLorenzo") in the amount of $375,000; and various judgments entered against the Debtor in the Superior Court of New Jersey. All told, the amount of the tax liens and mortgages appear to be approximately $1,294,000.

**C.    The Trustee's Action to Fix and/or Avoid Liens.**

16.    On January 2, 2009 the Trustee initiated an adversary proceeding to fix the extent and validity of certain liens, and/or to modify or avoid liens. Included as defendants in the Trustee's Complaint are the holders of the secured claims listed above, and the holders of certain state court judgment liens against the Debtor.

17.    The Trustee has reached agreements modifying the first two (2) mortgage liens against the KIA Property and appropriate settlement papers have been negotiated. Specifically, there is an agreement reducing the first mortgage lien of Hooper Street from $219,000 to $35,000 with the avoided lien of $184,000 being preserved for the benefit of the estate pursuant to 11 U.S.C. §551. Additionally, there is an agreement with Fortunato to reduce its second position lien

---

[1] Per the terms of the mortgage, Goldman/Di Lorenzo Group is defined as being comprised of Di Lorenzo Properties Company, L.P., York Associates, Inc., the Estate of Sol Goldman, the Estate of Irving Goldman, the Estate of Alex Di Lorenzo, Jr., and GHC Co., in Liquidation.

4

from $300,000 to approximately $75,367.69. Again, the avoided lien of roughly $224,632.31 is being preserved for the benefit of the estate.

18.   Based upon the above agreements, approximately $400,000 of the first $520,000 in secured mortgage claims will be directed to the benefit of the estate. At present, the tax liens have grown to an ostensible redemption amount of approximately $1.121 million[2], but that amount includes approximately $455,000 in interest at 18%. The principal amount of the tax liens is only about $626,000.[3] The pending adversary proceeding goes to the amount due under those liens including the appropriate interest factor. The Trustee believes that the 18% interest factor may be substantially reduced under Judge Kaplan's decision in In re Princeton Office Park, L.P., 423 BR 795 (Bankr. NJ 2010). Even at full payment, it would take approximately $1.3 million to pay off the tax liens and the secured creditor portion of the first two mortgages and produce a benefit to the estate in excess of $250,000.

19.   The sale proposed in the LOI herein is for the sum of $1.5 million. At that sale price, the tax liens and first two mortgages would be satisfied in full, and there would be anywhere from $250,000 (at full interest on the tax certificates) up to $550,000 (if the interest were, for instance, adjusted to a more commercially reasonable 6%) available for the benefit of the estate; the first $400,000 of which would constitute preserved liens. The proposed sale would, of course, ultimately be subject to higher and better offers which could, in turn, produce a further benefit to the estate.

---

[2] Of that amount, all but approximately $26,000 in liens are held by Quality. The remaining $26,000 in liens are held by Crusader Servicing Corp.

[3] There are other miscellaneous fees and charges included in the current payoff aggregating less than $50,000.

**D.      The Administration of the KIA Property.**

20.      From the beginning of this case, there have been issues and challenges marketing the
KIA Property due to various environmental issues and concerns.  Specifically, as of the filing there
was an open proceeding for environmental remediation being administered by the New Jersey
Department of Environmental Protection ("NJDEP") under the Industrial Site Recovery Act.
N.J.S.A 13:1K-6 et seq., and the regulations promulgated thereunder ("ISRA").

21.      The claims register in this matter reflects over $946 Million in filed claims flowing
from the potential environmental issues of the KIA Property both in terms of the ISRA clean-up
case and potential claims of the NJDEP and the United States Environmental Protection Agency
("EPA") and other agencies for Natural Resource Damages ("NRDs") arising out of possible
contribution by the KIA Property to contamination in the Passaic River Basin.

22.      Due to the nature of environmental laws, there are other parties, particularly, those
parties in the predecessor chain of title on the KIA Property, that are likewise exposed to liability
for the remediation of the KIA Property or damages flowing from the contamination.   The
Goldman/DiLorenzo is one such party who has exposure and potential liability for environmental
remediation and damages.

23.      Despite these challenges the Trustee has been working diligently in administering
the KIA Property under difficult circumstances. The Trustee initially retained a real estate
consultant and obtained an appraisal.  The Trustee also recognized that the biggest impediment to
the marketing of the KIA Property was the "unknown" in connection with potential environmental
costs and exposures.

24.      Approximately a year ago, there was a breakthrough of sorts in terms of the
Trustee's marketing efforts.  Specifically, Goldman/DiLorenzo, apparently in recognition of its

own potential liability, proposed a sale structure where it would pay the actual costs of remediation and environmental compliance over and above $1.5 million. This offer represented something of a "win-win" situation in that potential purchasers could put a finite cap on their potential exposure for environmental costs and Goldman/DiLorenzo would have closure on its potential exposure. Yet another "win" would be the public interest in seeing a dormant and decrepit KIA Property remediated of environmental contamination and restored to both the tax rolls and productive use.

**E.    The Original Letter of Intent with LHSP/Peres.**

25.    Based on the representations of Goldman/DiLorenzo, there was a spike of interest in the KIA Property. After preliminary discussions with a number of parties, the Trustee engaged in further discussions with the joint venture of Lerner Heidenberg Simon Properties and L. Peres & Associates, Inc. ("LHSP/Peres"). Ultimately, these discussions resulted in a signed letter of intent between LHSP/Peres and the Trustee whereby LHSP/Peres agreed to purchase the KIA Property for total consideration of $2.0 million, plus up to an additional $1.5 million which is dedicated to the environmental remediation of the site (the "LHSP/Peres LOI").    To the extent that the remediation cost more than $1.5 million, any excess was to be paid by Goldman/DiLorenzo. A copy of the signed letter of intent is attached to the Certification of David S. Catuogno, CM/ECF Docket No. 180; **Exhibit "B"**.

26.    The LHSP/Peres LOI contemplated further negotiations as to a final contract and the negotiation and execution of signed agreements with Goldman/DiLorenzo to memorialize and effectuate the mechanism for the environmental cleanup and the costs thereof. Despite esoteric issues and concerns, those negotiations were conducted in good faith over several months.    There were also substantial discussions with the EPA regarding claims and multiple drafts of the various complex and detailed transaction documents.

7

27.    Even though the basic framework of the deal was in place for months, the parties were still dealing with a complex property. It was easy enough for the Trustee to agree to sell, or the Buyer to agree to buy, or even for Goldman/DiLorenzo to agree to pay remediation costs. Simplicity aside, there is a pending ISRA case that must be administered and approvals that must be obtained, in terms of both environmental conditions and land use, before the KIA Property can be put to productive use. It was necessary to apportion risk, to set benchmarks for performance and funding, and to otherwise structure the transaction so that everyone's rights were protected and there was no undue exposure. This was a substantial challenge over the several months when the deal was being discussed.

28.    Against this backdrop, on September 10, 2009 the parties ultimately agreed on the form of contract and the Trustee filed a motion seeking authority to sell the KIA Property pursuant to 11 U.S.C. §363 (the "Sale Motion").

**F.    The Motion for Stay Relief filed by Quality Tax Holdings and Fortunato.**

29.    The Sale Motion was set for hearing on September 18, 2009. On the morning of the hearing, the sale collapsed under its own weight. Specifically, in the court house hallway, counsel for the Trustee was advised that one of the constituent members of Goldman/DiLorenzo refused to sign off on the proposed agreement between Goldman/DiLorenzo and LHSP/Peres relative to administration, control and funding of the environmental remediation process.[4] With the holdout, Goldman/Di Lorenzo lacked the authority to execute the negotiated agreements. Without the agreement(s), the LHSP/Peres joint venture was unable to commit to the purchase. Accordingly, the hearing on the Sale Motion was adjourned that morning and thereafter from time to time while the parties explored getting the deal back online, or potentially introducing Quality (or some

---

[4] Specifically, the Goldman/DiLorenzo holdout was Alex DiLorenzo, who, coincidentally, is also the principal in Fortunato and Quality.

nominee) as a substitute purchaser.  Ultimately, neither possibility came to fruition and the Court,

understandably, could no longer carry the motion on its calendar.  Accordingly, by letter dated

April 22, 2010, the Trustee withdrew the motion without prejudice.

**G.**     **The New Letter of Intent with Coremark and the Proposed Sale.**

30.     Shortly after withdrawing the sale motion, the Trustee was approached by Coremark

regarding their potential interest in acquiring the KIA Property.     After several meetings,

conferences and good faith negotiations, the Trustee and Coremark agreed on an LOI in

connection with a proposed sale "as is" in the amount of $1.5 million.

31.     The salient terms of the LOI can be summarized as follows:

- Purchase Price of $1.5 million "as is, where is";

- Initial Deposit of $50,000 upon signing of LOI ;

- Supplemental Deposit of $100,000 upon signing of contract;

- Due Diligence period of 120 days from signing of LOI relative to environmental considerations.  If, after 120 days, Purchaser's professionals believe more time is necessary, such period may be extended by commercially reasonable time as may be agreed to by parties and/or approved by Court to perform such additional investigations;

- If Purchaser terminates LOI during due diligence period, initial deposit shall be refunded;

- If Purchaser terminates, all reports and due diligence work product will be turned over to the Trustee and become property of the estate.  Buyer will be granted a priority administrative claim for the reasonable, actual and necessary costs for said reports/due diligence to be paid solely from the proceeds of any ultimate sale;

- During the due diligence period, parties shall negotiate terms of contract which will ultimately be brought before Bankruptcy Court for approval, and be subject to higher and better offers.  Towards that end, the Trustee will also formulate proposed sale procedures and submit same to the Court for approval;

- Closing shall occur on the later of (i) 30 days from the completion of due diligence; or (ii) 14 days from Court Order approving the sale pursuant to 11 U.S.C. §363;

- Title to be delivered free and clear of liens and encumbrances pursuant to 11 U.S.C. §363;

- Trustee shall assign all rights of recovery and contribution towards environmental remediation, including any insurance rights;

- If sale is ultimately approved to third party as "higher and better" offer, Purchaser shall be entitled to recover, from purchase price, reimbursement of actual reasonable and necessary due diligence costs as approved by the Court ("Expense Reimbursement"), as well as a Transaction Fee of $150,000;

- The Trustee shall not actively market the KIA Property to third parties during the due diligence period, however, this shall not impact the Trustee's rights to seek higher and better offers by advertising or providing notice of the proposed sale in connection with any Motion to approve the proposed sale that may be filed.

A copy of the LOI is attached hereto as **Exhibit "A"**.

**H.     The Proposed Break-Up Fee.**

32.     The Transaction Fee referenced in the LOI is tantamount to a "break-up" fee for Coremark as the stalking horse bidder. The Trustee is mindful that such fees are not necessarily favored in this Circuit but submits that such a fee is warranted in the instant case. Indeed, the Trustee submits that if ever there was a case where a break-up fee was appropriate, this would be it. This KIA Property needs to be sold. Coremark is the only real buyer who has been willing to stand up and commit to purchase same, but the caveat is that Coremark will not commit without the protection of the Transaction Fee.

33.     This case has been pending for more than three (3) years and, despite diligent efforts and some creativity, the KIA Property remains unsold. With the vagaries of the real estate market, the specter of the environmental remediation and the unrelenting advance of the property tax claims, this could be the Trustee's last best chance to sell the KIA Property.

34.    The controlling case in this Circuit relative to request for "break-up" fees in the context of a §363 Sale is <u>Calpine Corporation v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)</u>, 181 F.3rd 527 (3d Cir. 1999).

35.    The <u>O'Brien</u> case stands for the proposition that a determination whether a "break-up" fee should be allowed under Section 503(b) "must be made in reference to general administrative expenses jurisprudence." <u>O'Brien</u>, 181 F.3d at 535; *see also* <u>In re Beth Israel Hospital Association of Passaic</u>, (2007 Bankr. Lexis 2386) page 9, (Winfield, J.)).  The <u>O'Brien</u> court specifically held that there was no "compelling justification for treating an application for a "break-up" fee and expenses under Section 503(b) differently from other applications for administrative expenses under the same provision" <u>O'Brien</u> at 535; *see also* <u>In re Reliant Energy Channel View LLP</u>, 2010 U.S. App. Lexis 956, (3d Cir. 2010) page 4.

36.    In viewing a requested "break-up" fee through the prism of Section 503(b), the requesting party must "show that the fees were actually necessary to preserve the value of the estate" <u>O'Brien</u> at 535, and that "the expense provides some benefit to the Debtor's estate." <u>O'Brien</u> at 536.

37.    Here, the Trustee is able to satisfy this basic prerequisite of demonstrating a benefit to the estate.  Without a sale, there is no possibility of a benefit to the estate.  This sale and this Buyer represent the only chance for a benefit and Coremark will not proceed without the benefit of the Transaction Fee.

38.    The sale of the KIA Property is a just and necessary result, not only because it is the only hope for a benefit to the bankruptcy estate, it is also ineluctably in the public good for a dormant and decrepit blighted property to be brought back to productive use.  If the KIA Property

is sold and developed, a significant nuisance will be abated and the KIA Property can serve as an economic engine for a region in need of new opportunity and renewal.

39.    The Third Circuit has also recently found that "a "break-up" fee is not 'necessary to preserve the value of the estate' when the bidder *would have bid* even without the "break-up" fee." Reliant Energy, 2001 U.S. App. Lexis 956 at page 4 (*quoting* O'Brien at 535)(emphasis added).  In both the O'Brien and Reliant Energy, the proposed bidder sought allowance of a "break-up" fee before entering into the bidding process.  In both cases, the Court declined to allow "break-up" fees at the outset but allowed the bidder to reserve its rights to file such an application after the bidding process was completed.  In both cases, the bidders proceeded with making a bid and participated in the sale process even without assurance of any "break-up" fee, though in the Reliant Energy matter, the bidder apparently did condition its bid on the debtor's promise to seek authority to pay such a "break-up" fee.

40.    In evaluating the phenomenon, the Reliant Energy Court specifically stated "there is no escape from the fact that [bidder] *did* make its bid without the assurance of a "break-up" fee, and this fact destroys [bidder's] argument that the fee **was needed** to induce it to bid." Reliant Energy at page 5 (emphasis added).  Accordingly, in Reliant Energy the Third Circuit articulated a bright line rule that participating in a bidding process without the assurance of a "break-up" fee, by definition means that the "break-up" fee was not necessary to induce the bid and therefore cannot be awarded.

41.    Here, with the bright line now established, Coremark has come to the conclusion that it will not cross it.  Undoubtedly, Coremark will incur substantial costs in pursuing the LOI transaction.  As set forth in the LOI, the approval of Expense Reimbursement and the Transaction Fee "which represents the purchaser's fee for its work in establishing a bid standard or minimum

bid for other bidders, placing the KIA Property in a sales configuration made attractive to other bidders to the auction and by serving, by its name and its expressed interest, as a catalyst for other bidders" is a condition precedent for moving forward with the transaction.

42.     In order to be allowable, the proposed "break-up" fee must also be shown to be a catalyst for subsequent bidding. *See* O'Brien at 537; Beth Israel at page 9.  Obviously, if there are no other bidders the issue is moot.  There would have been no catalyst and Coremark will be the final approved purchaser.  If, however, there is bidding and a higher offer is ultimately approved, the Coremark offer undeniably would have served as a catalyst.

43.     Even in jurisdictions where "break-up" fees are more readily allowable, the fundamental notion is that the party seeking the fee did something to encourage or promote competitive bidding for the asset.  In this case, the Trustee submits that such a showing has been made.  Given the dynamics of the KIA Property, there has been precious little bidding or realistic interest.  Here and now, a viable developer has made a realistic "as is" offer and constructed a platform upon which other offers might possibly be considered.  Since the Coremark LOI is conditioned upon the approval of the Transaction Fee and Expense Reimbursement, there will be no sale process without them.  This is the very definition of a catalyst.  If there are other offers, the Coremark LOI and the sale process borne therefrom would undeniably satisfy the catalyst requirement for the allowance of a "break-up" fee.

## I.  Notice.

44.     Notice of this Motion has been given to all parties listed on the Certification of Service, which includes all secured parties, all creditors, all lienholders and all parties who have expressed an interest in the KIA Property.

WHEREFORE, it is respectfully requested that the Court enter an Order authorizing the Trustee to execute the LOI with Coremark and approving the Transaction Fee and Expense Reimbursement so that the Trustee may begin the sale process and this asset may be brought back to productive use.

Forman Holt Eliades & Ravin LLC
Attorneys for Charles M. Forman,
Chapter 7 Trustee

By: /s/ David S. Catuogno

Dated: July 23, 2010

M:\CMF\KEARNY INDUSTRIAL\SALE\App to approve Coremark LOI.doc

14

*EXHIBIT "A"*

**Lerner-Heidenberg Simon Properties**
**234 Closter Dock Road**
**Closter, NJ  07624**
**Phone: (201) 768-1300    Fax: (201) 768-3749**

February 6, 2009

Charles Forman Esq, Trustee
c/o David Catuogno, Esq.
Forman Holt Eliades & Ravin
80 Route 4 East
Suite 290
Paramus, NJ  07652

Re: 40 Marshall Street, Kearny, NJ.
(The "Property")

Dear Mr. Forman:

On behalf of a Joint Venture entity controlled by Lerner Heidenberg Simon Properties and L. Peres & Associates, Inc. (the "Purchaser"), we propose to enter into a contract with Charles M. Forman, Chapter 7 Trustee in the case of Kearny Industrial Associates, LP (Case # 07-10169 (NLW) (the "Trustee" or the "Seller") to purchase the interests described in Paragraph "A" below on the terms and conditions outlined in this letter agreement.

A.    The Interests. The interests to be acquired consist of a fee simple interest in the approximately 6.2 acre Property that is comprised of Lots 3 &4 of Block 14 in the Town of Kearny, Hudson County, NJ, which property is bounded by Passaic Avenue, Marshall Avenue and Belgrove Drive and which consists of or includes properties more commonly known as 44 Passaic Avenue, 25 Belgrove Drive 44 Marshall Avenue/60 Passaic Avenue in Kearny, New Jersey (the "Property").

B.    Purchase Price. The Purchase Price is Two Million Dollars ($2,000,000) together with additional consideration set forth in paragraph G. The $2,000,000 component of the Purchase Price shall be payable in cash at closing, subject to normal closing adjustments and prorations.

C.    Sales Contract and Deposit. Counsel for Seller shall prepare a Contract draft and a draft of the "Goldman/DeLorenzo" Guaranty within 15 business days from the Seller's acceptance of this letter agreement.  The Contract shall incorporate the points contained in this letter and, inter alia, provide for the Purchaser to deposit $150,000 into an escrow fund upon Purchaser's execution of the contract ("Initial Deposit") subject to approval of the United States Bankruptcy Court and Seller's execution of the Contract. The parties anticipate that the Trustee shall file a motion with the Bankruptcy Court for authority to

enter into the contract and approval of the proposed sale within 45 days of the provision of the draft Contract and Guaranty referenced above. If the contract signed by the Purhaser, or a modified contract as agreed to by the Purchaser and Seller, is not approved by the Bankruptcy Court and fully executed within 45 days of the Purchaser's tender of the Initial Deposit or such time as may be extended by the mutual agreement of the Purchaser and the Trustee, then either party shall have the right to cancel the contract and Purchaser shall receive the return of the Initial Deposit, with interest along with any breakup fee that may be awarded by the Court. If Purchaser cancels the Contract prior to the expiration of due diligence (set forth below and as may be supplemented by the Contract), then the Initial Deposit shall be returned to Purchaser. If Purchaser does not cancel the Contract prior to the expiration of due diligence, then Purchaser will make an addition deposit described in Paragraph E herein upon the expiration of the Due Diligence Period (the "Supplemental Deposit"). The Initial Deposit and the Supplemental Deposit shall be non-refundable except as provided for in Paragraph E and subject to Seller's performance under the terms of the Contract. Both deposits shall be applied to the Purchase Price at closing and interest shall follow the Deposits.

Concurrent with Purchaser's execution of the contract, the Trustee, G.H.C. Holdings Co.; The Estate of Sol Goldman; The Estate of Irving Goldman; and DiLorenzo Properties Company (collectively "Goldman/DiLorenzo" or the "Guarantor"), and/or a designee acceptable to Purchaser, shall execute a Guaranty securing any cost that must be expended in order to satisfactorily remediate the property in excess of a $1,500,000 base remediation responsibility of Purchaser. Purchaser shall deliver documentation at the closing in the form of a lenders commitment to fund its base remediation responsibility. Any sums expended by Purchaser to remediate and monitor the property, (including all legal, engineering and consulting fees incurred during and after Purchaser's Due Diligence Period with respect to the property remediation) shall be credited to and deducted from the Purchaser's base remediation contribution.

D.   <u>Due Diligence Materials and Access</u>. Seller shall make available to Purchaser all reasonably available documents that are in the Trustee's possession and specified on the attached modified Due Diligence Checklist (the "Due Diligence Materials"), including , Phase I and II environmental reports and related correspondence and information if same are reasonably available to the Trustee and he is otherwise authorized to release same . All documents will be returned promptly to Seller if the transaction contemplated herein is not consummated and all information will be dealt with on a confidential basis.

Purchaser shall have 90 days from the later of the date of the Trustee's execution of the contract upon authorization of the US Bankruptcy Court, the

2

execution of the Guaranty as described in paragraph C above and the delivery of the Due Diligence Materials to complete its due diligence (the "Due Diligence Period"). In the sole discretion of and at the sole election of Purchaser, if said inspection is unsatisfactory, Purchaser may terminate the Contract and the Initial Deposit shall be returned to the Purchaser. Purchaser will use all reasonable efforts to expedite its investigation as allowed by this paragraph.

E.  <u>Approval Period</u>.  If Purchaser does not cancel the Contract prior to the expiration of the Due Diligence Period, the Contract shall provide for the Purchaser to deposit an additional $50,000 (the "Supplemental Deposit") upon the expiration of the Due Diligence Period. During the Approval Period, Purchaser will seek to obtain all final, non-appealable site plan and other necessary municipal and governmental approvals including environmental approvals, but excluding building permits, for the demolition of the existing improvements and the development of at least 65,000 square feet of leasable retail space. Purchaser shall have up to twenty four months from the date the contract is fully executed to obtain all final, non-appealable approvals (the "Approval Period").

If Purchaser fails to obtain approvals within the Approval Period, then Purchaser may: a.) cancel the Contract and the Supplemental Deposit and that portion of the Initial Deposit equal to the out of pocket expenditures of Purchaser made prior to the cancellation, up to a maximum amount of $75,000 shall be returned to Purchaser; or b.) diligently prosecute said approval applications beyond the Approval Period until final applied for non-appealable approvals have been obtained. If Purchaser does not cancel the Contract prior to the expiration of the Approval Period, then the Initial Deposit and the Supplemental Deposit shall be non-refundable subject to Seller's performance under the terms of the Contract. The Supplemental Deposit together with the Initial Deposit shall be applied to the Purchase Price and interest shall follow the Deposits.

F.  <u>Conditions of Closing:</u>

1.  Clear Title free and clear from any monetary liens, claims and encumbrances

2.  NJDEP final approval of a remedial action plan, as further defined in paragraph G below, to address the environmental contamination present on the property.

3.  Satisfactory Guarantee of Goldman/DiLorenzo for the cost of

environmental cleanup or remediation in excess of $1,500,000. Said Guaranty shall be secured, upon the execution of the contract, by the Guarantor's deposit of $1,500,000 into an escrow fund, or provision of an irrevocable letter of credit or other form of security acceptable to the purchaser (the Pre-closing Guaranty Security"), to secure reimbursement of purchaser's environmental expense, which funds shall be released to Purchaser to the extent of actual dollars spent in the event that Guarantor or Seller default under the sale contract or Guaranty. Upon closing, the Guaranty shall be secured either by rolling over the Pre-Closing Guaranty Security or by the establishment of an escrow account ("Environmental Reserve Account"). An amount equal to 150% of the estimated cost (as determined by Purchaser's Environmental Consultant, which firm shall be reasonably approved by Trustee and Goldman) to remediate the property <u>less the difference between $1,500,000 and the amounts expended by Purchaser for all legal, consulting and investigative fees</u> shall be funded by Goldman/DiLorenzo or any agreed nominee and deposited into the Environmental Reserve Account. Purchaser shall be promptly reimbursed from the Environmental Reserve Account for all expenses incurred in excess of the $1,500,000 referenced herein. Thereafter, any shortfall shall be promptly funded by the Guarantor and the balance in the Environmental Reserve Account, if any, shall be promptly released to Goldman /DiLorenzo upon the issuance of an NFA for both soils and groundwater from the NJDEP and the EPA (if applicable).

    4.  Settlement with the EPA and NJDEP with respect to NRD claims on terms reasonably acceptable to Purchaser.

G.   <u>Remediation:</u> Following NJDEP's approval of a remedial action workplan(s) for the property Purchaser may, at its own cost, not to exceed $1,500,000 (subject to the Goldman/DiLorenzo Guaranty and the Environmental Reserve Account), proceed to execute the remedial action workplan(s) that shall address Soils, Groundwater, Asbestos and future monitoring until NJDEP's final approval and no further action ("NFA") letters are received. Should the cost of said final approval and NFAs be less than $1,500,000 the balance shall be distributed equally between the parties.

H.   <u>Closing Date.</u> The Closing Date shall be not later than 60 days following the expiration of the Approval Period and the satisfaction of the items contained in section F above.

I.   <u>Additional Leasing and Lease Modifications.</u> Following the execution of this Agreement and until such time as this Agreement is terminated, Seller agrees that no new leases shall be signed nor existing leases modified without the consent of Purchaser, which consent shall not be unreasonably withheld.

J.   **Withdrawal of Interests to be Acquired.**   The parties acknowledge that this agreement is a letter of intent and shall merge into a subsequent contract which shall be subject to the approval of the United States Bankruptcy Court and that this Agreement only reflects the current intentions of the parties but is not binding upon the parties and is subject to the execution of a formal contract.

K.   **Brokerage Commissions.**   Both Seller and Purchaser each warrant to the other that no broker has been involved in this transaction.

L.   **Break Up Fee:**   Following the full execution of this Letter of Intent, if the Court approves the sale of the Property to a party other than the Purchaser, purchaser shall be entitled to receive, as a "break up" fee consisting of its out of pocket expenses incurred up until that time, i.e. due diligence, attorneys fees, consulting fees, which break up fee must be approved by the Bankruptcy Court.

M.   Construction

To the extent of any inconsistencies between this Letter of Intent and any contract subsequently executed between the parties, the contract will control, unless otherwise noted.

This Letter may be executed in counterpart.

If the foregoing is agreeable to you, please execute below and return a copy to me. This offer shall expire if not accepted on or before February 13, 2009. For purposes of this Agreement, the date of this Agreement shall be the date it is signed by Seller. We very much look forward to working with you on this transaction. If you would like to learn more about our company, please visit our website at www.lernerheidenberg.com.

Sincerely,

Purchaser

By: _____

_____, on behalf of the Purchaser        Date:_____

Accepted by Seller:

By: _____

_____, On behalf of the Seller        Date: _____

5

## "DUE DILIGENCE CHECKLIST"

1. "As-built" site plan and floor plans.

2. 2006/2007/2008 Tax Bills,

3. Any cross-easement or reciprocal use agreements and any use restrictions.

4. Survey and most recent title insurance policy.

5. All Environmental reports and correspondence.

6. Information in the trustee's possession, regarding any restrictions (other than those imposed by the local zoning ordinance and building code) relating to the Property.

7. Any Wetlands delineation, if available to the trustee.

8. Lower Passaic River Cleanup claim of the USEPA.

9. All correspondence from government or municipal authorities with in the last three years in the trustee's possession.

6